IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                          No. CR 06-2482 MCA

CORNELIO PETERS-FEHR,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Cornelio Peters-Fuhr's *Motion to Suppress Physical Evidence and Statements* [Doc. 15] filed on December 28, 2006. The Court held an evidentiary hearing on Defendant's motion in Las Cruces, New Mexico, on January 24, 2007. Having fully considered the parties' submissions, the applicable law, the evidence and the arguments of counsel presented at the hearing, and being fully advised in the premises, the Court denies Defendant's motion based upon the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

1.    United States Border Patrol Agent Bryan Ford was on duty patrolling Highway 81 on or about October 3, 2006, when the events described below occurred.

2.    The portion of Highway 81 that Agent Ford was patrolling on that date is located in a rural, sparsely populated area in the "bootheel" region of the State of New

Mexico less than 25 miles from the international border between the United States and Mexico.

3.    The international border with Mexico runs along both the south side and the east side of the bootheel region where this section of Highway 81 is located, and thus illegal border crossings may lead to Highway 81 from either the south or the east.

4.    The only lawful border crossing in the area is the Antelope Wells Port of Entry, located along the southern border with Mexico.

5.    The portion of Highway 81 that Agent Ford was patrolling runs north from the Antelope Wells Port of Entry at the international border with Mexico and does not pass through any significant population centers or intersect with interstate travel routes north of the border; such interstate travel routes and population centers are all located several miles further north than the section of Highway 81 that Agent Ford was patrolling.

6.    Because of his frequent patrols in the area and its sparse population, Agent Ford had come to know and recognize the local residents and ranch workers who regularly traveled on this portion of Highway 81, as well as their vehicles and social customs.

7.    Because of his frequent patrols in the area and its sparse population, Agent Ford also has come to know the traffic patterns on this portion of Highway 81, which typically handles no more than five to ten vehicles per day.

8.    Agent Ford also knew and recognized that the Border Patrol has previously experienced illegal border-crossings involving controlled substances and illegal aliens on this section of Highway 81 in the past, some of which involved the use of cattle trailers.

9.      While his unmarked Border Patrol vehicle was driving south on Highway 81 shortly after 4:00 p.m., Agent Ford observed an extended-cab pickup truck pulling a livestock trailer loaded with cattle driving north on Highway 81 near mile marker 26.

10.     Agent Ford regarded the timing of this observation as significant because it coincided with the Border Patrol's shift change, when it is routine for Border Patrol vehicles to be traveling north toward the Border Patrol station as the agents on patrol end their shift.

11.     Agent Ford observed that the pickup truck and trailer were of a size and configuration that was capable of concealing significant quantities of contraband and/or illegal aliens, and unlike the practice of local ranchers, the driver of the pickup truck did not slow down, greet, or wave at Agent Ford when their vehicles passed one another.

12.     Agent Ford also noted that the pickup truck was a high-end "Lariat" model with a two-tone paint job, and that it was not common for ranchers in the area to use such a luxury-model truck for hauling cattle.

13.     Although the pickup truck and trailer had New Mexico license plates, Agent Ford did not recognize the vehicle or its occupant as being from, or commonly seen in, the local area.

14.     Agent Ford also ruled out the possibility that the pickup truck and its contents came through the Antelope Wells Port of Entry with Mexico, because he knew that the type of livestock the pickup truck and trailer were transporting was not permitted to pass through that port of entry.

15.     Except for the known local ranch traffic noted above and the occasional tourist traffic passing through the Antelope Wells Port of Entry, it was not likely that there would be other legitimate forms of traffic traveling northbound on this section of Highway 81, because there are no population centers or intersections with interstate travel routes from which such legitimate traffic could have originated.

16.     For the above reasons, Agent Ford decided to turn his Border Patrol vehicle around and follow the pickup truck and trailer.

17.     While following the pickup truck and trailer, Agent Ford did not observe any traffic violations.

18.     Nevertheless, the totality of the circumstances gave Agent Ford a reasonable suspicion that the pickup truck and trailer originated from an illegal border crossing and were transporting contraband or illegal aliens.

19.     Agent Ford proceeded to conduct a traffic stop in order to investigate these suspicions.

20.     Defendant Cornelio Peters-Fehr was subsequently identified as the driver of the pickup truck carrying the trailer.

21.     Defendant responded to the traffic stop in a normal manner by pulling to the side of the road and stopping; he made no attempt to evade or retreat from Agent Ford's Border Patrol vehicle.

22.     Agent Ford conducted the traffic stop in a normal manner, clearly identifying himself as a Border Patrol agent but not drawing his firearm or addressing Defendant in a threatening manner.

23.     Shortly after Defendant pulled over and stopped the pickup truck and trailer, Border Patrol Agent Brieden arrived in uniform in a marked Border Patrol vehicle to assist with the traffic stop.

24.     After the pickup truck pulled over and stopped, Agent Ford approached the driver's side door and began conversing with Defendant; when it became apparent that Defendant preferred to converse in Spanish, Agent Ford conversed in Spanish with him, and both men understood the content of their conversation.

25.     Agent Ford initially asked Defendant to identify his citizenship; Defendant responded that he was a citizen of Mexico.

26.     Agent Ford next asked Defendant whether he had any immigration documents, and Defendant responded by producing a Canadian identification card.

27.     The Canadian identification card produced by Defendant did not explain his presence in the United States at that time.

28.     Based on the totality of the circumstances known to the agents at the time Defendant responded to the request for immigration documents, they had probable cause to detain Defendant for being present in the United States illegally.

29.     Before performing a full custodial arrest, and while Defendant was still unrestrained as he walked from the pickup truck to the marked Border Patrol vehicle, Agent Ford asked Defendant for permission to search the pickup truck and trailer.

30.     Defendant knowingly and voluntarily consented to the search of the pickup truck and trailer.

31.     After giving his consent to search the pickup truck and trailer, Defendant continued walking to the marked Border Patrol vehicle and, at Agent Ford's request, remained seated in the back of the marked Border Patrol vehicle while the agents performed the search.

32.     After receiving Defendant's consent, Agent Ford conducted a brief, cursory visual search of the pickup truck and trailer for the limited purpose of ensuring his safety and preparing to conduct a canine search around the exterior of the vehicles; Agent Ford did not discover any other persons or illegal cargo during this cursory visual search.

33.     Agent Ford then retrieved his drug-detection dog from his vehicle and, using his skills as a certified canine-handler, inspected the exterior surfaces of the pickup truck and trailer using the dog's drug-sniffing capabilities.

34.     Agent Ford's dog alerted to the front bottom portion of the trailer, and upon further inspection of that area of the trailer, the agents observed that the floor level on which the cattle were standing did not match the floor level as measured from underneath the trailer.

35.     Suspecting that a false floor had been constructed in the trailer, Agent Brieden then entered the trailer, moved the cattle, and lifted a rubber floor mat, revealing a seam in the floor of the trailer.

36.     The agents pulled at the seam in the trailer floor and discovered a hidden compartment underneath it that concealed 329 bundles containing a total of 1,458 pounds (or 662 kilograms) of a substance that, based on their training and experience, the agents readily identified as marijuana.

37.     Upon discovering the hidden compartment in the floor of the trailer, Agent Ford placed Defendant under arrest and advised him of his rights under Miranda v. Arizona, 384 U.S. 436 (1966).

38.     Defendant knowingly and voluntarily waived his Miranda rights and told Agent Ford that he was being paid $2,000.00 to drive the pickup truck and trailer to Deming, New Mexico.

39.     In order to orient Defendant as to what would happen next, the agents explained to him after his arrest that he would be taken before a Magistrate Judge and that an attorney would be appointed to represent him.

40.     Defendant was familiar with this process because he had been arrested and booked in the United States on at least one prior occasion in the recent past, where he did eventually appear before a judge and receive the advice of appointed counsel.

41.     The Border Patrol agents became aware of Defendant's prior arrest when they booked him at the Lordsburg Border Patrol Station and received a "red alert" from their

database indicating that Defendant had an outstanding warrant from Hidalgo County magistrate court.

42.     However, the agents could not take Defendant to court immediately following his arrest on the evening of October 3, 2006, because it took them until the following morning to complete the process of searching the trailer, securing the evidence, arranging for the livestock in the trailer to be inspected and quarantined, transporting both the Defendant and the evidence to the vicinity of the Lordsburg Border Patrol Station several miles away, and writing the police reports necessary to turn the case over for prosecution.

43.     Because of their need to complete these legitimate law-enforcement activities before taking Defendant to court or transferring him to another detention facility, Defendant remained in temporary detention in a cell at the Lordsburg Border Patrol Station overnight.

44.     Defendant's temporary detention in the Lordsburg Border Patrol Station overnight was not the result of any deliberate effort by the Border Patrol agents to delay the matter or deceive anyone.

45.     Defendant was not subjected to inhumane conditions of confinement while in temporary detention at the Lordsburg Border Patrol Station overnight; he had access to basic necessities and was provided a bench and blankets to sleep on.

46.     During that time, Defendant never requested to make a telephone call, and the Border Patrol agents did not deny him the opportunity to make such a call.

47.     At approximately 8:20 a.m. the next morning, before taking Defendant to court or transferring him to another detention facility, Border Patrol Agent Cisneros again advised Defendant of his <u>Miranda</u> rights and spoke to him in Spanish.

48.     Defendant again knowingly and voluntarily waived his <u>Miranda</u> rights and proceeded to make more incriminating statements in which he provided additional details about the incident and admitted knowing that the trailer contained a controlled substance.

49.     The Border Patrol agents' testimony as to their treatment of Defendant while he was in their custody is credible; Defendant's testimony that he invoked his <u>Miranda</u> rights and that he was threatened with torture or otherwise mistreated or deceived by the Border Patrol agents is not credible.

50.     Considering the totality of the circumstances, Defendant's statements to the agents were not taken in violation of his <u>Miranda</u> rights, nor were they a result of any form of deception or inhumane treatment that would violate the Due Process Clause.

## II.     <u>LEGAL ANALYSIS AND CONCLUSIONS OF LAW</u>

The primary focus of Defendant's motion to suppress is on whether the Border Patrol agent's decision to conduct a traffic stop of the pickup truck and trailer was legally justified at its inception.  In his motion papers, Defendant further asserts that his subsequent consent to search the pickup truck and trailer, as well as any incriminating statements he gave to the agents, must be suppressed because they are tainted by the alleged Fourth Amendment violation at the inception of the traffic stop.  At the suppression hearing, Defendant also

asserted that his incriminating statements to Agent Cisneros at the Lordsburg Border Patrol Station were involuntary.

I first address whether the traffic stop was justified at its inception and then turn to the related questions concerning the validity of Defendant's consent to search, his waiver of his <u>Miranda</u> rights, and the voluntariness of his statements.  I conclude that, under the totality of the circumstances, the traffic stop was justified by a reasonable suspicion that Defendant was transporting illegal aliens or contraband in the pickup truck and/or trailer.  I further conclude that Defendant's consent to the search, his waiver of <u>Miranda</u> rights, and his statements to the Border Patrol agents were knowing, voluntary, and untainted by any violation of the Fourth or Fifth Amendments.  It follows that there is no basis to invoke the exclusionary rule, and Defendant's motion to suppress must be denied.

The Fourth Amendment to the United States Constitution protects Defendant's right to be secure in his person and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness."  <u>United States v. Chadwick</u>, 433 U.S. 1, 12 (1977), <u>overruled in part on other grounds</u>, <u>California v. Acevado</u>, 500 U.S. 565 (1991).

Defendant has standing to challenge the seizure of his person regardless of his possessory interest or property interest in the truck he was driving or the trailer he was pulling, <u>see</u> <u>United States v. Shareef</u>, 100 F.3d 1491, 1500 (10th Cir. 1996), and it is the Government's burden to show that this warrantless seizure was reasonable, <u>see</u> <u>United States</u>

v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993).  If the Government cannot meet this burden, then the evidence obtained as a result of the seizure must be suppressed unless it was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the unlawful seizure.  Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); see United States v. Erwin, 875 F.2d 268, 269 n.2 (10th Cir. 1989).

The traffic stop that occurred here is a form of investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "'in order to determine his identity or to maintain the status quo momentarily while obtaining more information.'" Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000) (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "'must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'"  Id. (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001) (en banc).

In the special context of patrolling the international border, the Supreme Court and the Tenth Circuit have developed a list of factors to be considered in determining whether reasonable suspicion of criminal activity is present.  These factors include:

> "(1) characteristics of the area in which the vehicle is encountered;  (2) the proximity of the area to the border;  (3) the usual patterns of traffic on the particular road;  (4) the previous experience of the agent with alien traffic;  (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments;  and (8) the appearance that the vehicle is heavily loaded."

United States v. Quintana-Garcia, 343 F.3d 1266, 1270 (10th Cir. 2003) (quoting United States v. Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003)); accord United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975).

Although guided by these factors, "the ultimate assessment of reasonable suspicion depends on the totality of the circumstances." Gandara-Salinas, 327 F.3d at 1130.  Thus, the Court cannot subdivide its analysis into separate findings that each factor, when viewed in isolation from the rest, is readily susceptible of an innocent explanation.  See United States v. Arvizu, 534 U.S. 266, 274 (2002); accord Gandara-Salinas, 327 F.3d at 1130.  Rather, the Court's analysis must recognize that reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'"  United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994) (quoting Terry, 392 U.S. at 22).

"In examining the totality of the circumstances, '[c]ommon sense and ordinary human experience are to be employed,' and 'deference is to be accorded to a law enforcement

officer's ability to distinguish between innocent and suspicious actions.'"  United States v. De La Cruz-Tapia, 162 F.3d 1275,  1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)).  In particular, the Court must "accord deference to the agent's ability to 'draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person.'"  Gandara-Salinas, 327 F.3d at 1130 (quoting Arvizu, 534 U.S. at 273).

An agent cannot, however, predicate an investigative detention solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 946.  Although it is "possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'"  Id. (quoting Karnes v. Skrutski, 62 F.3d 485, 496 (3d Cir. 1995)).

Ordinarily, when a law enforcement officer is patrolling a vast expanse of interstate highway or a heavily trafficked urban environment, the fact that the officer does not know or recognize a particular vehicle or its occupants is so innocuous that it does not form the basis for a reasonable suspicion of criminal activity.  But this fact takes on greater significance in the special context presented here, where (1) a Border Patrol agent is patrolling a sparsely populated section of highway close to the international border where traffic from illegal border crossings has been apprehended in the past, (2) the vehicle is

-13-

traveling from a direction that is not connected to any significant population center or interstate travel route, (3) the possibility of a legitimate border crossing at the only port of entry is excluded by the nature of the vehicle's cargo, and (4) the timing of the trip coincides with the Border Patrol's shift change.

When viewed in their totality, the circumstances presented here add up to a reasonable suspicion that criminal activity was afoot at the time of the traffic stop. The stop occurred in a sparsely populated rural area bordered by Mexico on both the south and the east, where the highway could be accessed from several illegal border crossings. The Border Patrol has previously experienced such illegal border crossings in this area involving both controlled substances and illegal aliens. Thus, the available information concerning the location of the stop and the pattern of prior illegal activity in the area weighs in favor of the conclusion that the agent's suspicions about Defendant were reasonable. See Gandara-Salinas, 327 F.3d at 1130; Quintana-Garcia, 343 F.3d at 1271-73. The location and direction in which Defendant was traveling also made his behavior suspicious when taken together with the fact that the agent did not recognize Defendant, the pickup truck, or the trailer as belonging to the local ranch traffic.

The agent was unlikely to be mistaken about whether Defendant and his cargo were acting in a manner consistent with that of the local ranch traffic, because the agent had considerable experience patrolling the region and was thoroughly familiar with the local residents and their vehicles, social customs, and traffic patterns in this particular area. When considered in the context of the agent's training and experience in patrolling the bootheel

region of southwestern New Mexico, his observations support the conclusion that the presence of Defendant driving a pickup truck carrying a trailer of cattle traveling northbound from the border with Mexico on Highway 81 was out of the ordinary and inconsistent with the traffic patterns of legitimate travelers.

The final factors to be considered are those relating to the characteristics of the vehicle in which Defendant was traveling.  The agent had the opportunity to observe these characteristics from the vantage point of his vehicle as the pickup truck and trailer passed in front of him, as well as when he followed the vehicle from behind before initiating the traffic stop.  Given that the pickup truck was a full-sized, extended-cab model carrying a stock trailer, the agent who initiated the traffic stop could have reasonably suspected that it was an "effective smuggling vessel." Quintana-Garcia, 343 F.3d at 1274.  Further, the agent observed that the pickup truck was a luxury model with a two-tone paint job, which, in the experience of the agent, is not the type of vehicle that is commonly used for the task of hauling cattle.

When all of the relevant factors are considered in the aggregate, the agent possessed a reasonable suspicion that Defendant and his truck were involved in criminal activity at the time that the investigative detention began.  It follows that the traffic stop of Defendant's pickup truck was justified at its inception.

I must also consider whether the agents' actions remained within the proper scope of an investigative detention unless and until they developed the probable cause necessary to effectuate a full custodial arrest.  During a valid investigatory stop, the Fourth Amendment

permits a Border Patrol agent to ask the person being detained to provide information about his or her identity and citizenship, respond to objectively reasonable concerns about the agent's safety, and explain suspicious circumstances, "but any further detention or search must be based on consent or probable cause." Brignoni-Ponce, 422 U.S. at 881-82; see generally Holt, 264 F.3d at 1220-26, 1228-30. In this case, the agents acted within the permissible scope of an investigative detention when eliciting information from Defendant about his identity and citizenship.

The agent's next question was to ask Defendant for consent to search the pickup truck and trailer. As the agent's questioning had not yet exceeded the permissible scope of an investigative detention, Defendant's consent to the search was untainted by any Fourth Amendment violation up to that point.

Nevertheless, it remains the Government's burden to prove that Defendant's consent to the search of the pickup truck and trailer was knowing and voluntary. In order to meet this burden, Defendant's consent must be unequivocal and specific; it must be freely and intelligently given; and there must be no duress or coercion. See United States v. Drayton, 536 U.S. 194, 206-07 (2002); United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567 (10th Cir. 1993). However, the fact that a person is still being detained by police at the time a consent to search is obtained does not necessarily render his or her consent involuntary, see Rodriguez-Garcia, 983 F.2d at 1567, nor does it create a presumption that the consent to search is involuntary, see United States v. Price, 925 F.2d 1268, 1270-71 (10th Cir. 1991).

Rather, the Court must consider the totality of the circumstances.  See Drayton, 536 U.S. at 207.

 In this case, the totality of the circumstances indicates that Defendant's consent to search the truck was knowing and voluntary even if he was not free to leave the scene at the time it was given.   There is no indication that Defendant could not understand the agent's request or raised any objection to it.  Further, there is no indication of an express or implied show of force by the agents present at the scene that would suggest the consent was obtained under coercion or duress.  At the time the agent requested and received consent to search, Defendant had not yet been physically restrained or placed in a Border Patrol vehicle.  In light of these circumstances, I conclude that Defendants' consent to the search of the vehicle was knowing, voluntary, and untainted by any Fourth Amendment violation.  See Rodriguez-Garcia, 983 F.2d at 1567-68.

 After obtaining Defendant's consent, the agents directed him to sit in the back of one of the marked Border Patrol vehicles while they conducted the search.  Placing Defendant in that location for a brief period might be viewed as a permissible security measure during an investigative detention.  See Holt, 264 F.3d at 1223; United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993).  At some point, however, the agents' seizure of Defendant's person in the back of the Border Patrol vehicle exceeded the limited scope or duration of an investigative detention and became a full custodial arrest.  An arrest is a seizure that is "'characterized by highly intrusive or lengthy search or detention.'"  Oliver, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)).  The general

rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest.  United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994); accord Florida v. Royer, 460 U.S. 491, 499 (1983) (plurality opinion).

Inasmuch as an arrest exceeds the limited scope or duration of an investigative stop, it must be supported by probable cause.  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).  "[T]he standard of probable cause 'applie[s] to all arrests, without the need to "balance" the interests and circumstances involved in particular situations.'"  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001) (quoting Dunaway v. New York, 442 U.S. 200, 208 (1979)).

But the probable-cause standard does "'not require the same type of specific evidence of each element of the offense as would be needed to support a conviction.'"  United States v. Pollack, 895 F.2d 686, 691 (10th Cir. 1990) (quoting Adams, 407 U.S. at 148-49).  Indeed, "[t]he fact that the police did not, at the time of arrest, know exactly what crime had occurred is not relevant, so long as they had probable cause to believe 'an offense' had been committed."  United States v. Edwards, 242 F.3d 928, 935 (10th Cir. 2001) (quoting United States v. Maher, 919 F.2d 1482, 1485 (10th Cir. 1990)).

Probable cause is an objective standard, and thus the individual officer's subjective belief whether there is probable cause to arrest is not dispositive.  See United States v. Davis,

197 F.3d 1048, 1051 (10th Cir. 1999) (citing <u>Royer</u>, 460 U.S. at 507).  Furthermore, "[t]hat an officer did not believe probable cause existed to detain a suspect does not preclude the Government from justifying the suspect's detention by probable cause."  <u>United States v. Santana-Garcia</u>, 264 F.3d 1188, 1192 (10th Cir. 2001) (citing <u>Royer</u>, 460 U.S. at 507).

In this case, the agents had probable cause to arrest Defendant based on his initial responses to Agent Ford's questions about his identity and citizenship.  Specifically, the agents had probable cause to arrest Defendant for being present in the United States unlawfully because he stated he was a citizen of Mexico and produced no valid documentation or logical explanation for his presence in the United States at that time.

Further, when Agent Ford's drug-detection dog alerted near the front portion of the trailer, the agents had probable cause not only to arrest Defendant, but also to search the trailer for contraband.  Soon after the dog alerted, the agents observed the disparity in the floor level of the trailer, which gave them probable cause to suspect it contained a hidden compartment or false floor.  Under the "automobile exception" to the warrant requirement, probable cause alone is legally sufficient to support the search of the trailer, even if there was some delay between the time the vehicle was stopped and the time the search was completed. <u>See</u> <u>Chambers v. Maroney</u>, 399 U.S. 42, 51-52 (1970); <u>Florida v. Meyers</u>, 466 U.S. 380, 382 (1984); <u>Michigan v. Thomas</u>, 458 U.S. 259, 261 (1982) (per curiam); <u>Texas v. White</u>, 423 U.S. 67, 68 (1975) (per curiam).

After discovering the contraband hidden beneath the trailer's false floor, the agent's next step was to formally place Defendant under arrest and advise him of his <u>Miranda</u> rights.

-19-

Defendant's waiver of those rights, and his subsequent statements to the Border Patrol agents, were untainted by any Fourth Amendment violation.  And Because Defendant was given <u>Miranda</u> warnings before the agents questioned him about the offenses for which he has been indicted in this case, <u>Miranda</u> does not provide a basis for suppressing Defendant's subsequent statements to the agents.  <u>See</u> <u>United States v. Gell-Iren</u>, 146 F.3d 827, 830-31 (10th Cir. 1998).

Nevertheless, at the suppression hearing, Defendant's counsel argued that Defendant's post-arrest statements should be suppressed on other grounds not previously mentioned in his motion papers.  Under the Due Process Clause, the question of voluntariness may constitute an additional inquiry that is not entirely subsumed by the Court's analysis of the Fourth Amendment "fruit of the poisonous tree" doctrine or the <u>Miranda</u> warnings required under the Fifth Amendment.  <u>See, e.g.</u>, <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000) (distinguishing voluntariness test from <u>Miranda</u> requirements).  The voluntariness of a confession is determined by examining the totality of the circumstances, including  "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was  advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." <u>United States v. Lopez</u>, 437 F.3d 1059, 1063-64 (10th Cir. 2006).

In examining these factors, the Court focuses on whether Defendant's capacity for self-determination was critically impaired by some form of official coercion on the part of the agents, not whether he was influenced by moral and psychological pressures to confess

emanating from other sources.  See United States v. Pettigrew, 468 F.3d 626, 637-38 (10th Cir. 2006).  In other words, the due-process inquiry turns on whether "'the government obtains incriminating statements through acts, threats, or promises which cause the defendant's will to be overborne.'"  Lopez, 437 F.3d at 1063 (10th Cir. 2006) (quoting United States v. Toles, 297 F.3d 959, 965 (10th Cir. 2002)).

Unlike the facts in Lopez, there is no credible evidence that the agents in the case at bar made any misrepresentations or promises of leniency in order to induce Defendant to confess.  There is also no credible evidence that Defendant was subjected to, or threatened with, physical punishment in order to induce a confession in this case.  Rather, the only objective factor that Defendant can point to is the length of his detention before making his statement to Agent Cisneros, i.e., the fact that he was detained overnight at the Lordsburg Border Patrol Station and questioned the next morning before being taken to court and receiving a court-appointed attorney.

This factor does not amount to a showing of the type of official coercion that is sufficient to render a confession involuntary.  Defendant has not shown how his overnight detention at the Lordsburg Border Patrol station placed him in any physical distress, nor has he shown any reason for believing that the agents were going to detain him in that location indefinitely unless and until he confessed.  Defendant was familiar with the process of being arrested, booked, and taken to court in the United States because he had been through that process before in the recent past, and the agents had twice advised him of his Miranda rights before he gave his statement to Agent Cisneros.  There is no credible evidence that

Defendant did not understand these rights, or that the agents circumvented the requirements of <u>Miranda</u> through surreptitious promises or threats.

Further, there is an obvious explanation for the length of Defendant's detention at the Lordsburg Border Patrol station, namely the fact that his arrest occurred in the evening hours and the agents had a large amount of evidence and property to search, secure, and process before the matter could be turned over for prosecution.   Under the totality of the circumstances, Defendant's statements to Agent Cisneros on the morning of October 4, 2006, were voluntary.

## III.   CONCLUSION

For the foregoing reasons, the agents' search and seizure of Defendant and his vehicle were reasonable, and his incriminating statements were taken pursuant to a knowing and voluntary waiver of his <u>Miranda</u> rights.   Thus, there is no basis for excluding any of the evidence or statements obtained as a result of these actions.

**IT IS, THEREFORE, ORDERED** that Defendant Cornelio Peters-Fuhr's *Motion to Suppress Physical Evidence and Statements* [Doc. 15] is **DENIED**.

**SO ORDERED** this 14th day of February, 2007, in Las Cruces, New Mexico.

_____
**M. CHRISTINA ARMIJO**
United States District Judge